JOHN F. SCHEE, Guardian, Appellee, v. ELIZA PHELPS et al., Appellants.

**EQUITY: Rewriting Contract.** The principle that equity, having once obtained jurisdiction, will retain it for full settlement of the litigation, does not embrace the power, in the absence of fraud, accident, mistake, *or breach*, to rewrite a contract and provide for performance at a time and place different from that provided in such contract.

*Appeal from Warren District Court.*—W. H. FAHEY, Judge.

NOVEMBER 22, 1918.

SUIT to cancel a contract and conveyance made by Ribble to the appellants. The trial court sustained the conveyance; and, while it does not seem to have formally cancelled the contract, it gave a money allowance, on the theory that the appellants had breached the contract. The defendants appeal.—*Reversed.*

*O. C. Brown,* for appellants.

*Berry & Watson,* for appellee.

SALINGER, J.—I. The plaintiff sues as the guardian of John Ribble. He alleges matter upon which he prays that a contract made between Ribble and the defendants should be set aside. This phase of the case is at an end. The trial court declined to give this relief, and no appeal from this finding and decree has been perfected. This situation carries down with it relief prayed by the defendants in a cross-bill, wherein relief prayed is asked in the alternative, and only in event that the deed and contract between Ribble and the defendants were set aside, which, as has just been said, was not done.

The plaintiff asked, in the alternative, and in event that the deed and contract were not set aside and cancelled, and title quieted in the guardian, that defendants be held liable for the support of Ribble after leaving the home of the defendants; be held liable for the expense of the guardianship; that said support and expense be established as a lien against the premises deeded by Ribble to the defendants. Whether this relief is warranted upon the petition is not a question before us, because the petition was in no manner assailed. Therefore, all we have is whether the breaches of the contract alleged, or some one or more material breaches alleged, have been established by a preponderance of the testimony.

Some of these allegations have no support in the evidence. Others are not an averment that the contract has

been breached, but state what is material only if the contract has been breached. Still others have been disposed of by action of the trial court as to which there is no appeal. What remains are allegations:

That, after the delivery of the deed to the premises, to wit, on or about the 6th of April, 1910, the defendants began to mistreat and misuse Ribble, and to fail to provide him with the necessities of life or the comforts of a home; they required him to sleep in a room without fire in the winter time; refused to furnish him with money with which to provide himself with the necessities of life; that they would continually abuse and mistreat him, which treatment continued until on or about the 10th of August, 1914, when it became so bad that Ribble was no longer able to stay with defendants, and was obliged to leave; that he was compelled to leave because of the treatment to which he was subjected by the defendants, and because his life was endangered by said treatment.

The answer denies every allegation in the petition, unless specifically admitted in the answer. It avers that defendants have complied in every way with their said contract until Ribble left them; that Ribble had no cause to leave, and was persuaded and induced to do so by others, who, for various reasons, tried to create dissatisfaction in Ribble's mind with his home, and with what defendants were doing for him, and who ultimately succeeded in getting him to leave and remain away; and that the defendants are ready, willing, and able to continue the performance of their said contract.

So far as is material at this point, the trial court held that the contract between Ribble and defendants is valid; that defendants had not complied with the contract to support Ribble: and it ordered defendants to pay the reasonable value of support furnished after Ribble left the home of defendants, and to be furnished.

The sole reliance upon authority advanced by the appellees is the text in 16 Cyc., pages 106 and 107, which is to the effect that, where a court of equity once obtains jurisdiction, it will retain it to administer complete relief and do entire justice with respect to the subject-matter, and will proceed to determine any other equities existing between the parties connected with the main subject of the suit, and grant all relief requisite to an entire adjustment of such subject, provided it be authorized by the pleading; and that, therefore, relief of an equitable character may thus be incidentally obtained, when an original bill would not lie for such relief alone. We are unable to see how this affects two well-settled rules: one, that a court of equity has no power to make a new contract for the parties, nor change the terms thereof, either as to time or place of performance (*Stewart v. Pierce,* 116 Iowa 733, 744) ; the other, that it has no power to modify the terms of a written contract, in the absence of fraud, accident, or mistake, and must either decree specific performance or deny it, or, in a proper case, relegate the parties to their action at law for damages. Pomeroy on Contracts, Sections 162 to 165. Nor are we able to follow the assertion of the appellee that the decree in the case at bar does not change the contract, but simply holds the appellant to the performance of the contract to support and care for John Ribble as long as he shall live. In taking this position, appellee does not overlook that, while the contract provides that the defendants shall care for, maintain, support, and provide a comfortable living for and care for Ribble "in the way of providing medicine, doctor bills and other attendance which may be necessary and proper in case of his sickness * * * and in every other way provide for him in a comfortable and decent way," that, attached to each of these agreements, is the specific further statement that this is to be done while Ribble lives on the premises, and "while he lives and makes

his home with said parties of the second part on the premises above described." The avoidance of the appellee is that, while there is this limitation, it is not controlling, because the trial court found "that they failed to do this, and refused to furnish him support, care, clothing and a comfortable home elsewhere;" and that thereupon, the court ordered that defendants pay a stated amount to the guardian, that he may provide for Ribble what appellants have refused to do. This is an entirely apt avoidance, if the finding of the trial court is conclusive upon us. It cannot be questioned that, if it was rightly found the appellants had breached the contract, that the court of equity had power to determine that damages due for such breach were the reasonable value of such support as the defendants had agreed to furnish. But the keystone to this arch of reasoning is the claim that the trial court was justified in finding that plaintiff had proven, by a preponderance of the testimony, that the defendants had breached the contract. That finding is not conclusive upon us on this review; and, if we are constrained to hold that the finding below is not supported by the evidence, we can affirm only by holding that a court of equity may, in the absence of fraud, accident, or mistake, change an agreement to furnish certain support on certain premises, and while Ribble lived and made his home with defendants on those premises, into a contract that the defendants shall furnish the contract support by paying cash for the support of Ribble furnished him while he was not living on said premises, and not making his home thereon with the defendants. It is manifest, then, we cannot uphold the decree unless we can find from the evidence that the defendants have broken their agreement. If they have not done so, we cannot rewrite the contract; and, hard as it may be, we must allow the defendants to retain title to the property conveyed to them by Ribble, even as the trial court did, and must say to

Ribble that, though the defendants have this property, he
can have no support, unless he returns to the defendants
and receives it from them while living with them; and
that this must continue unless, upon his return, the defend-
ants breach the contract.   We are driven to the evidence;
and we have examined it with the greatest care, because of
what may result if it be found not to sustain the holding
below.   And our view of it follows:

II.    There is much testimony which we cannot con-
sider, in determining where the preponderance lies.   It con-
sists of self-serving declarations made by Ribble to others,
and repeated by these others, and, in one instance, the tes-
timony of Ribble of what he told others.   A typical sample
is found in the statement of the witness Graham that Ribble
told witness many times that Ribble had no stove in his
room, and that at times there was no artificial heat of any
kind; and in the testimony of Guthrie that Ribble said to
Guthrie the defendants had prejudiced all of Ribble's
friends against Ribble, and all these friends had forsaken
him.   Other witnesses speak to declarations by Ribble that
proper food was refused him on his request, and that he
had to go hungry, many times.   There is too much of it to
detail; but that pointed out is, as said, thoroughly typical.

III.    Mrs. Phelps says Ribble did not have to do his
own chamber work, and she always saw to it that his bed
was attended to and made; that he never had to make his
bed, or anything of that kind:   Mrs. Schee, that sometimes
his bed was not made: and Ribble, that Mrs. Phelps gener-
ally made his bed, but that sometimes he has made it, and
sometimes he has gone to bed when it was not made.

### 3-a

Ribble testifies he dressed and undressed all the time
without help, and that defendants never offered or asked
him if he needed any help:   Mrs. Phelps, that he never asked
for such help; that she often asked him if he didn't want

some help, and he answered that he would rather help himself.

### 3-b

Ribble is the only witness who says that Mrs. Phelps required him to look after the chamber, and that he generally took it out himself, unless he was sick, and not able to, do it, and that, in that case, defendants took it out and emptied it; that, when he had to get up at night, he had to do it unassisted; that there was no cover to the vessel, and he had to set it outside, when he had finished with it; and that defendants did not often pay attention to him after he went to bed. Mrs. Phelps admits he had trouble in his bowels, and frequently had "trouble of that kind," in his room; but adds that he never had to carry out' his chamber, and that, when Ribble was not feeling well, her husband never failed to get up nights and go into his room to see if he was all right. Sadler testifies that he has seen Mrs. Phelps go into Ribble's room, and heard her ask him if he was fixed all right, and his answering that he was.

### 3-c

Ribble says he had a basin for taking a bath; that, in warm weather, he took the bath in his room, and in cold weather, in the kitchen; that, while "they" would put in the clothes he was to put on after bathing, they never helped him or gave him further attention. But he adds that he never asked for assistance, nor for anything as to the bath or bathing. Mrs. Phelps says she always fixed the water and soap and towels and clean clothes, and asked him if she could help him in any way, and he answered that, as long as he was about, he would rather just help himself.

As we gather it, Ribble makes some complaint about the son of the defendants' interfering with his bath, on at least one occasion. As to this, Mrs. Phelps says it is not true that Ribble was kept out of the kitchen part of the time and prevented from taking his bath because the boy

had locked him out; and the boy says that he (the boy)· was taking one; that Ribble came to the door, which was a swinging one, opened it, and wanted to know if it was going to take the boy all morning to take a bath; and that he (the boy) did not order Ribble out, or fuss with him; and that, on this occasion, he didn't keep him waiting more than five or ten minutes.

### 3-d

The wife of plaintiff says that Ribble's room presented a very shabby appearance, and that, at one time when she saw it, it looked very unkept. On the other hand, Mr. Sadler testifies Ribble told him the room was comfortable, and he would rather sleep in it than any other, and that he had the best bedroom in the house. Demory says the room looked comfortable; Mrs. Sadler, that she has been in this room when it looked comfortable.

### 3-e

Ribble says he had trouble getting out of bed, because his leg gave out, and trouble in returning, because of trouble in walking in the dark to find his bed; and that, though he called, he got no answer. There is no evidence that his call was heard. Ribble says that, while sometimes he could not get up by himself, that generally he could. It appears that the house had no city lighting, no connection with city water, city light, or sewer system, no sewer, no furnace, no steam heat, and that there is neither toilet nor bath in the house. Also, that this was the case while Ribble owned the house. Mrs. Phelps says that, when they took possession of the house, Ribble was in the habit of having a light, and said that, now that defendants were there, he didn't feel he needed a light any more, and that they might stop leaving it; and that she always left· a lamp burning whenever he requested it; and that he never complained to her about not having a light to go to bed by. Ribble admits that sometimes they would leave

a light burning on the dining room table, but says that
sometimes it was dark. The son testifies that Ribble's room
was lighted in the evening by a lamp sitting on his bureau.

### 3-f

The room occupied by Ribble is the one he occupied
before the defendants moved in. It has a low ceiling, and
is small. It has no flue, and no place for a stove. It is
south off of a room used for a dining room, when defend-
ants had company, and which is about 13x14. There is a
door between it and this bedroom, and the latter has a
door opening to the south. The bedroom was in the south
part of the house, and Ribble says it was a pretty chilly
room when a south wind blew: Mrs. Schee, the room was
about the center of the house, and that all the heating was
done by a stove in the northwest room of the house; that,
in the winter, the heating was done by a stove in the
parlor, which was not run in the fall or spring; and that,
in these two seasons, the heating was done by a stove in
the dining room. Ribble confirms this, and adds that a
large place was cut out between the dining room and the
parlor; that the house was heated by a cook range in the
kitchen and a hard coal stove in the parlor; and that his
room had the same heating given the room of the defend-
ants. Mrs. Schee says that, before the defendants came,
Ribble always had a stove in front of the door of his bed-
room; that this stove was removed; that then there was
no fire to warm the bedroom except through another room;
and that the door between the bedroom and this room
was kept closed in the daytime, so there would be no
heat, except a little at night, even when the door was not
closed. On the very face of it, much of this testimony
of Mrs. Schee cannot be based upon personal knowledge,
because there is no claim that she was at the home of the
defendants at all frequently,—much less, that she was there
constantly. Now, as against this, it should again be noted

that the bedroom had a low ceiling and was small, and that the dining room was small. Mrs. Phelps testifies they always had plenty of heat, and that they kept fires going as late as July, and never took the stove in the dining room down until then. If it may be said that it is questioned, it is overwhelmingly established that a stove used to heat the bedroom stands in this small dining room, just in front of the door from it into the bedroom. The son testifies a soft coal heater in the dining room was set within six or eight feet of the bedroom, and that fire was kept in this stove all night. It is conceded that the defendants put an oil stove into the bedroom, and the only modification of the concession is the testimony of Ribble that, after the oil stove was put in, defendants paid no more attention to it; that they put it in occasionally, when it was very cold; and that, while once or twice it burned all night, it would ordinarily not burn all night. Mr. Sadler testifies that, when he was there in winter, there was always fire in a stove in the dining room, and that this stove is close to the door into the bedroom. Tissling says that a fire was kept in the dining room, and it was always warm. Mr. Sadler testifies there was a range in the kitchen and a soft coal burner in the dining room; and Cassie Sadler, that the house was not heated with one stove all the time, and was always comfortable. Mrs. Phelps says that the bedroom was heated part of the time from the dining room stove, close to the door, and that, when it was necessary, she had an oil stove, to warm the bedroom sufficiently; that she always had the oil stove in, when it was extra cold; that she put warm irons in the bed, until Ribble said he would rather have a hot water bottle, and then she furnished those; and that, after he was in bed, she usually saw if he had covers enough and if he was all right; and that he always said he was.

About the only real complaint by Ribble himself is a

statement that, a good part of the day, he stayed in his room, if it was warm enough. The wife of plaintiff adds that, at one time, when the door between the bedroom and the dining room was shut, she found the room very cold.

It appears Mr. Ribble never complained of being cold in that room, nor of being cold, and that he never was heard to complain of the heating of the room; and he himself admits he made no such complaint.

IV. Ribble had no teeth, and says that, while at first they had very good bread, toward the last it was so hard he couldn't eat it. Mrs. Phelps responds it is probable that at times her bread is not as good as it is at other times, but she thinks that, as a general thing, she has good bread; that she did not make him eat hard bread; and that he never complained about any bread being hard.

### 4-a

Ribble says that, when at the table, he just had to reach and get what he wanted; and nothing was handed round; that he could not see well, and often did not know what the things on the table were, and had to ask for them, and get them himself; that "they" refused to give him something on just one occasion; that, at this time, the old lady Phelps offered to hand him a bread dish, and the boy kind of shook his hand at her, and said, "If he wants the bread, let him get it himself." Purcell testifies the victuals were passed to Ribble along with the others, and he was helped first; Sadler, that there was nothing on the table that Ribble could not see, and that was not brought to him, and that defendants tried to care for him and wait on him. The boy says he did tell his grandmother Phelps to quit passing bread across the son's plate to Ribble, and said that he would pass it to Ribble, himself; and the defendant Mrs. Phelps says that the boy may have fussed a little about their passing things over his own plate to

Ribble, and told them he didn't want them to pass things
over his plate, and that, if Mr. Ribble wanted anything,
he (the son) would pass it to him.

4-b

So far as Ribble himself is concerned, we find but two
complaints made by him.  One deals, not with what was
done by the defendants, but by their son;  and it is that,
one day, when there was pie on the table, the boy took up
the dish it was on, slammed it on the floor, and said he
would go where he could get something to eat;  and that,
when the boy came home from school, he would be mad if
dinner was not ready, and mad if the rest had begun to
eat.   The other complaint is that, though he was unable
to reach some things, and to see others because of bad eye-
sight, defendants hardly ever helped him to anything on
the table.   As against this, Moore, Cassie Sadler, and
Graves testify that Ribble was not neglected at the table,
in any way.   Moore and Graves say that Ribble received
good treatment at table;  Mr. Sadler, that it was the best
kind of treatment;  and Tissling, that Ribble was treated
well.   Demory and Cassie Sadler testify that Ribble sat
down at table with the others, and at the times the others
did.   Cassie Sadler and defendant Eliza Phelps say that
Ribble was always called to meals.   Purcell says that he
was the first man called;  Eliza, that she generally called
him, herself;  Purcell and Sadler, that he was the first
man at the table;  Eliza, that he came as soon as the rest;
and Mr. Sadler, that Ribble was always present and ready
for his meals.   Defendant Eliza Phelps testifies that, when
they first moved, Ribble said he needed nothing extra, and
would just eat what the rest of the folks did;  and that she
told him that if he at any time couldn't do this, just to
let her know, and she would get what he wanted;  and that
she was able and willing to do that.   She says he always
saw things that were on the table;  that he ate whatever

was on the table; that he was welcome to the best. She and Moore, Cassie Sadler, and Tissling, say Ribble had the same food as the rest. Eliza adds that he ate with the rest; that, whenever he asked for anything, it was passed to him immediately; and that she saw to it that he was well cared for at the table; that he helped himself more than once to what was on the table. The son testifies he passed food to him and that Ribble ate whatever the others had; Mrs. Purcell, that defendant Eliza's table fare was good enough for anybody; and Cassie Sadler, that defendant's table board was always good. Mrs. Purcell says that Eliza is a good housekeeper, and "can't be beat as a housewife;" and that she is as good a cook as witness has ever known. Cassie Sadler declares her to be a fine cook, and Mr. Sadler testifies Ribble told him that he (Ribble) had the best cook he ever had in his life. Eliza testifies they had plenty of food on the table; that he told her they had plenty of food, and that everything tasted good; and that he made no complaint at the table: and Demory, Purcell, and Harold say Ribble never complained he didn't have enough.

V. The situation was one that might quite naturally create some unpleasant friction in the household, even though it had no relation to Ribble himself. Mrs. Phelps had with her her foster mother, who was 85 years old and childish, and had a cancer which required Mrs. Phelps to poultice it every day for weeks; and also the mother of her husband, aged 82, and afflicted with paralysis. The foster mother and the mother-in-law were all hard of hearing, and the son of the family was a 16-year-old boy, with whom the foster mother found lots of fault. Grandmother Phelps and the boy would sometimes have fusses, and the old lady would feel badly about it, and say she wished she would die, and would ask defendant Eliza to forgive her for the trouble she had been making her. According to one wit-

ness, there was jangling between Eliza Phelps and the foster mother, and sometimes between her and the two old women. Ribble says, as a general thing, the mother and son had a fuss about three times a day. Loud talking and quarreling have been heard between the two. According to Ribble, these two were always quarreling and always had trouble, and that sometimes this occurred in his presence. But the boy testified that he didn't quarrel with Ribble, and no one disputes this. It is testified to, and not disputed, Ribble told the old ladies how he thought the son should be raised, and that, if he had a boy, he would make him work hard; that he frequently talked about the boy, and said he didn't amount to much, and seemed generally disposed to criticise him. It is the testimony of Eliza, and is not disputed, that the boy never treated Mr. Ribble disrespectfully, and never gave him a cross word; and that she and her son never quarreled regarding Ribble, in the presence of Ribble: and that of Demory, that all always treated Ribble very well.

VI.  Cassie Sadler says that, whenever she was at the home of defendants, Ribble was receiving careful attention and treatment; Purcell, that Ribble's treatment was good, and witness knows of no neglect of Ribble.

Ribble says he was left alone, after the two old ladies who had also lived on the premises had died, and as much as half of the time in daytime; that he was left of nights while defendants went up town, he guesses; that sometimes they told him they were going, and sometimes they didn't. This would happen both in warm weather and in winter time; they would be up town when he thought they had gone to bed, and once or twice, he didn't know they had gone.  Graham testifies that the defendants were gone from home a good many times, both in day and nighttime, and left Ribble alone; and another witness says she has been on the premises a number of times when Ribble was

alone. It will be noticed there is no testimony that this caused Ribble any injury, or even annoyance; that it is not said he disliked being left alone, or that he suffered anything from being left alone. Be that as it may, there is substantial conflict on the point, and much of the counter testimony is not disputed. Mrs. Phelps testifies that they were away but a few times, while Ribble was there; that these were occasions when she attended a lodge that met on the first Wednesday in the month; that, for the last year, there has been no lodge, and she was away very infrequently; that they would not be out later than half past eight or nine, when they were out; that most always, Ribble wouldn't go, and would say that he made no objection, and supposed they wouldn't be gone long; that they told him they would not be, and were not; that sometimes the boy was there with him; that it was usually quite late before she could get ready to go; that she then often asked him to go with her; and that he stayed alone because he always refused to go; and that he made no complaint, and told them to go if they wanted to.

Related is some claim that Ribble's going out was not approved of or possibly interfered with. As to this, his own testimony is that the defendants took him to the cemetery on the last Decoration Day, and that he does not remember whether they took him more than that; that once he went to Laverty's, and just turned around back again; that Mrs. Phelps asked him where he had been, and he told her; that she said, after this she wanted him to tell her, and to ask if he could go; that he told her he would see about that; that, after that, he always went, but told her he was going, when he wanted to go; that he didn't ask her if he might go, but merely told her he was going.

VII. It seems to be conceded that Ribble turned over $225 to the defendants, and that this was to be used for

improving the property conveyed by Ribble. On the other hand, it seems to be conceded that, though this is so, there was some loose understanding that, if Ribble wanted some little spending money, it should be paid him, because of the surrender of this $225. Ribble admits he got some of this, but thinks it was not as much as $50; and that, on one occasion, he was furnished money to get, or was gotten, a suit of clothes. He asserts that, when he wanted money, defendants said they didn't have it. It seems that, in one instance, he wanted $5.00, and Mrs. Phelps told him she didn't have it, without going to town; and that, thereupon, Ribble said he had friends he could get it from, and got $5.00 of Laverty; and that Mrs. Phelps agreed to repay Laverty. It seems clear that more than the $225 was spent on improving the property, and that, in a sense, all the little advances made to Ribble were gratuitous. Mrs. Phelps says that, notwithstanding, he never asked for money that he didn't get. Colored by the fact that defendants made little advances that they were, perhaps, in strictness not bound to make, is an instance or instances wherein the defendant Carmi Phelps called Ribble a liar. Ribble requested some money of Mrs. Phelps to get a suit of clothes. She told him she would go to town and get the money for him. Instead of getting it there, she brought home a suit for his inspection. When she told Ribble this, he threw the clothes as far as he could, and said he wasn't going to have that suit; and Mrs. Phelps adds she doesn't know all he did say he was going to do. Her husband found her crying. When he asked her what the matter was, she told him what Ribble had done, and her husband asked Ribble what made him do this. Ribble responded that he had never asked defendants to come, and that he had never wanted them to come; and Mr. Phelps said, "That is a lie,"—and the evidence shows it was a lie. Ribble answered, "I will let no man call me a liar." Mrs. Phelps says they were about to have

some trouble, and she stopped it. On the same occasion, perhaps, Phelps told Ribble that Ribble had no money there, and Ribble said he had; and according to Ribble, Phelps answered that Ribble was a liar; and Ribble told him that, if he called him a liar again, that he would knock him down with his cane. When Laverty spoke to the defendants about it, he said that Phelps should not have called the old man a liar, and Phelps answered, "Oh, I ought not to have done it." Ribble himself said, speaking to others as to this, that he had had a fuss with Carmi, and that he (Ribble) might or should be a little more careful with them.

VIII. Ribble says that sometimes, when friends gave him candy, and he went to get it, he found it gone, and he thinks defendants had a good deal of it; that this occurred very often, but he did not ask what became of it; that, one day, a young woman brought him a jar of fruit, which he put in his room; and that it was gone, when he went to get it. Mrs. Phelps testifies that, when anything was given Ribble, she told him to put it in his room and use it for himself; that she knows nothing of anyone taking any such things away; and that Ribble made no complaint of any such taking.

IX. Mrs. Phelps testifies that Ribble never made any demands on her,—never made a request that she do anything for him; that he always said he was very well satisfied, had a good home, and was well contented, and never made any complaint to her. Ribble himself says he never made any complaint, but adds that he was not that kind. When, after Ribble had left, Mrs. Phelps asked him what they had done, he still made no specific complaint, and merely said, "You haven't lived up to your contract."

When pressed to say, as a witness, what was the inducing cause of his leaving, Ribble said that he concluded he could not stay with them any longer, because he thought

he wasn't exactly safe.  And when asked what made him think that, answered, "Well, their actions towards me justify me for it;" that he was unwilling to live there longer, because he was "a little afraid to live there any longer,— afraid there might something happen to me, and thought I would get out."  In another place,—and this is the only other definite statement on the point,—he says, "They kept fussing with me, and I just got up and left."  There is absolutely no evidence that his safety was threatened in any way, or that anyone fussed with him, outside the one instance in which the word "liar" passed, and on which he "fussed" as much as anyone did.  And it is the undisputed testimony of Moore that he (Ribble) said to him that he (Ribble) left, and that it might be he had done wrong; that he didn't know.

X.  Some of the witnesses frankly show they are biased against the defendants, and a general tendency to over-color against defendants is quite manifest.  There are many instances in which the complaint is made by witnesses for Ribble, and not by him.  Take the witness Jennie Laverty, who injects that Ribble sometimes complained about his clothing, and once, that a shirt didn't look just like he wanted to have it, and that he had on a shirt that had been worn a long time, which was not very clean, and much patched.  As said, Ribble makes no complaint on any such score; and the testimony, on the whole, shows quite satisfactorily that defendants bought all necessary and suitable clothing.  Another witness injects a refusal to furnish Ribble flowers for use on Memorial Day, and says he desired to take some, and Mrs. Phelps said not to take any. She immediately modified this by adding that Mrs. Phelps said she would take some flowers out, herself, and put them on the grave of Ribble's wife.  Mrs. Phelps says that no Memorial Day has passed, since he lived with them, that they have not taken Ribble and flowers to the cemetery;

and that all there was to the incident was that Ribble wanted her to give some flowers to this witness to take, and that she told him they were going to take him there, and to take some flowers; and that he said, "All right;" and that, even after that, said witness went to the peony bush, and helped herself to what she wanted. Another injection by the same witness is that, when she asked Mrs. Phelps for Ribble's quilts and rugs, she produced three rugs that were old and ragged, and four quilts that were very much worn, and said, in effect, that that was all he had. But it appears without dispute that Ribble had given his best quilts away to his niece, shortly after the death of his wife.

Another injection by Mrs. Schee is that, on one visit, when the parlor was very close and warm, and Ribble opened the hall door a little, to let air in, Mrs. Phelps gave him a very angry look, shut the door, walked out, without anything being said, and then returned, and opened a window to the north. No such complaint seems to have occurred to Ribble; and Mrs. Phelps testifies that, on the occasion spoken of, she had a niece there, with a baby; that Mr. Ribble said it was very warm; that thereupon, Mrs. Phelps opened the window and closed the door; that Ribble opened the door; and she said: "Mr. Ribble, we can't have the door and window both open, as it makes a draft for the baby." This is not disputed.

We do not overlook that the testimony, on the whole, carries a denial that any outside interference existed, or that any outside inducements were brought to bear, to cause Ribble to leave. But it comes from the witnesses who do the overcoloring and show the bias; and we incline to the belief that all the circumstances indicate that we would not have this controversy, if outside influences had not intervened.

The preponderance is against, rather than for, plaintiff.

It is true, Ribble appears very much satisfied with his present surroundings, and that he is unwilling to return; and we are aware that no great good will come from this decision, which, in effect, compels Ribble, a man over 90, to return, on pain of losing both his property and his means of support. This situation is due to no fault of this court, nor of the law. It arises from the terms of the contract, and the fact that the trial court held it a binding contract, and that no one has appealed from that holding. But no material breach of the contract is proved, and the defendants are shown to be ready, willing, and able to continue to perform, as soon as Ribble shall make that possible. Any hardship that may result can only be avoided by our taking the place of the parties and writing a new contract for them, or giving relief as for a breach of contract, when no breach is shown. We may not so avoid it.

We are constrained to dissent from the conclusions reached below, and the cause must be—*Reversed.*

PRESTON, C. J., LADD and EVANS, JJ., concur.